# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| In the Matter of: | } | |
| MICAH CHAD EASTERLING | } | CASE NO. 18-80055-CRJ-7 |
| SSN:   XXX-XX-6378 | } | |
| ALEXANDERIA KAY EASTERLING | } | |
| SSN:   XXX-XX-2298 | } | CHAPTER 7 |
| | } | |
| Debtor(s). | } | |
| | | |
| | } | AP NO. 18-80041-CRJ-7 |
| GIL MADSEN | } | |
| PATRICIA MADSEN | } | |
| Plaintiff(s), | } | |
| v. | } | |
| | } | |
| MICAH CHAD EASTERLING | } | |
| ALEXANDERIA KAY EASTERLING | } | |
| Defendant(s). | } | |

## MEMORANDUM OPINION ON AMENDED COMPLAINT
## FOR DETERMINATION OF DISCHARGEABILITY
## AND OBJECTION TO DISCHARGE

This Adversary Proceeding came before the Court on November 14, 2018 for trial upon

the Amended Complaint for Determination of Dischargeability and Objection to Discharge filed

by Gil and Patricia Madsen (collectively, the "Plaintiffs") against Micah and Alexanderia

Easterling (collectively, the "Defendants"). The issues before the Court arise out of the sale of a

Nestle Toll House Café franchise by the Plaintiffs, as the owners of P&G Foods, LLC, to the

Defendants, as the owners of Artistic Discovery, LLC. The Plaintiffs seek to have their claim

against the Defendants for the unpaid balance due under the terms of a Promissory Note, executed

by the Defendants when they purchased the franchise, excepted from discharge pursuant to 11

U.S.C. § 523(a)(2)(A). In the alternative, the Plaintiffs seek to have the Defendants' Chapter 7

discharge denied pursuant to 11 U.S.C. §§ 727(a)(2), 727(a)(3) and 727(a)(5).

On November 15, 2018, the Court entered an Order Requiring Post-Trial Briefs, directing the parties to address specifically how the testimony and evidence presented during the trial relates to each element of the Plaintiffs' claims. On January 14, 2019, the parties timely submitted their respective Post-Trial Briefs, after which the Court took the matter under advisement. The Court has now considered the testimony and evidence presented at trial, the arguments of counsel, the Post-Trial Briefs, and the applicable law, and makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

## I.   FINDINGS OF FACT

1. On April 24, 2008, the Plaintiffs formed an Alabama limited liability company known as P&G Foods, LLC (hereinafter "P&G Foods") to operate a franchised cookie shop in Athens, Alabama known as Nestle Toll House Café by Chip (hereinafter the "Café").

2. The Plaintiffs invested $200,000 in the Café, paying $30,000 for the franchise and $170,000 for equipment and the build-out of the leased premises. The Plaintiffs opened the business in July of 2008, with Patricia Madsen (hereinafter "Madsen") running the daily operations of the Café.   Madsen testified that the franchisor, Crest Foods, Inc., required the Café to bake items fresh daily, using both approved products and the franchisor's point-of-sale system.

3. Prior to opening the Café, the Plaintiffs operated an Auntie Anne's franchise in Tuscaloosa, Alabama from 2007 through 2009 under an Alabama limited liability company known as Madsen, LLC. Madsen operated both franchises for a short time period, before closing the

---

[1]     To the extent, any of the Court's findings of fact constitute conclusions of law, they are adopted as such. Alternatively, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

Tuscaloosa store in early 2009.

4. On March 13, 2009, the Plaintiffs filed an individual Chapter 7 petition in the United States Bankruptcy Court for the Northern District of Alabama, Northern Division, Case No. 09-81029. The Plaintiffs valued their ownership interests in both Madsen, LLC and P&G Foods at $1.00 each, despite having invested $200,000 in the Café just months prior to filing their Chapter 7 petition.

5. While Madsen admitted that the Café was not profitable the first four years that she operated the business, she testified that the Café finally became profitable in 2012 before the Plaintiffs sold the business. On cross-examination, Madsen admitted, however, that tax liens were filed against the Café during 2012. On July 23, 2012, the Department of Treasury, Internal Revenue Service recorded a Notice of Federal Tax Lien in the Judge of Probate, Limestone County, Alabama for $7,044.92 against P&G Foods.[2] On October 17, 2012, the State of Alabama Department of Revenue also issued a Certificate of Lien for Taxes for the Quarter ending March 31, 2012 against P&G Foods for $597.37 and a Certificate of Lien for Taxes for the Quarter ending June 30, 2012 against the LLC for $512.47.[3] After depreciation, P&G Foods 2013 Federal Tax Return also reflects a continuing loss of $23,675.[4]

6. Madsen testified that she decided to sell the Café because Gil Madsen's employer transferred him to Kentucky where the Plaintiffs continue to reside.

7. Alexanderia Easterling (hereinafter "Easterling") graduated from Athens State College in 2012 where she met Madsen while taking art classes. Easterling began working at the Café

---

[2]     Notice of Federal Tax Lien, Defendants' Ex. 28.
[3]     Certificates of Lien for Taxes, Defendants' Ex. 29.
[4]     P&G Foods, LLC 2013 Tax Return, Defendants' Ex. 13.

3

a few months before Madsen listed the business for sale.

8. While working at the Café, Easterling also began offering art classes to students at agreeable locations, which Easterling referred to as a traveling art studio. On May 9, 2013, the Defendants formed an Alabama limited liability company known as Artistic Discovery, LLC (hereinafter "Artistic Discovery") to operate the traveling art studio.[5]

9. Upon learning that the Café was for sale, Easterling approached Madsen about purchasing the business. Other than briefly operating the traveling art studio, the Defendants were not experienced business owners. The only due diligence they performed before purchasing the Café was to review records maintained by Madsen on QuickBooks and to seek advice from a family member whom the Defendants described as financially stable. The Defendants failed to obtain copies of P&G Foods' tax returns, to check for tax liens, or to inquire regarding prior bankruptcies.

10. After the Defendants expressed interest in purchasing the Café, Madsen contacted the franchisor to determine whether P&G Foods could assign its Franchise Agreement to the Defendants. Prior to purchasing the Café, the Defendants met with the franchisor and Easterling traveled to Texas to obtain training from the franchisor. Easterling testified that the franchisor taught her how to bake cookies, but failed to teach her anything about operating the business.

11. On August 8, 2013, the Defendants amended the Articles of Organization for Artistic Discovery, expanding the LLC's business purpose to provide services as deemed necessary for the operation of a Nestle Toll House Café, in addition to continuing to offer art classes

---

[5]        Articles of Organization, Defendants' Ex. 26.

and any other lawful purpose.[6] On August 8, 2013, the parties entered into a Purchase of Business Agreement (hereinafter the "Purchase Agreement"), pursuant to which the Defendants purchased all assets of P&G Foods in relation to its operation of the Café, including the equipment, inventory, books, and goodwill for a purchase price of $114,000, payable at $500 per month for the first year.[7]

12. The Purchase Agreement defines the term "Seller" as "P & G Foods, LLC . . . owned by Gil J. and Patricia Madsen," and the term "Purchaser" as "Artistic Discovery, LLC, owned by Micah C. and Alexanderia K. Easterling."[8] The Plaintiffs and the Defendants both signed the Purchase Agreement in their individual capacities, not as owners of their respective limited liability companies.

13. Paragraph four of the Purchase Agreement provides, in part, that "[a]ll assets of the business remain property of Gil J. and Patricia E. Madsen" until the debt is satisfied.[9] The Purchase Agreement further required the Purchaser "to keep all equipment in operating condition at all times."[10]

14. On August 8, 2013, the parties executed a Promissory Note, in lieu of a personal guarantee, pursuant to which the Defendants borrowed $112,000 from the Plaintiffs, payable at $786.99 per month with interest at 3.25%.[11]

15. On August 15, 2013, P&G Foods assigned its Franchise Agreement with Crest Foods, Inc. to Artistic Discovery. The Franchise Agreement defines Artistic Discovery as the

---

[6]     Amended Articles of Organization, Defendants' Ex. 27.
[7]     Purchase of Business Agreement, Plaintiffs' Ex. 5.
[8]     Purchase of Business Agreement, Plaintiffs' Ex. 5, ¶ 4.
[9]     Purchase of Business Agreement, Plaintiffs' Ex. 5, ¶ 7.
[10]    Purchase of Business Agreement, Plaintiffs' Ex. 5, ¶ 7.
[11]    Promissory Note, Plaintiffs' Ex 6.

5

"Assignee" and P&G Foods as the "Assignor."[12] The Defendants signed the Franchise Agreement as the owners of Artistic Discovery. The Defendants also signed the Franchise Agreement in their individual capacities as the "New Controlling Principals."

16. The Defendants paid a $10,000 transfer fee to Crest Foods, Inc. to transfer the Franchise Agreement. Easterling testified that she understood that the Defendants were to follow the terms of the Franchise Agreement as the New Controlling Principals. However, Easterling further testified that both the franchisor and the Plaintiffs knew that she intended to sell art and to offer art classes at the Café. Easterling testified that she received verbal permission from the franchisor to operate the art business so long as it was separate from the cookie business. Easterling further testified that she would not have purchased the business without approval from the franchisor to offer art classes at the Café.

17. Gil Madsen testified that the Defendants never mentioned their plans to operate the business as an art studio when the parties met to execute the Purchase Agreement. Micah Easterling contradicted Madsen's testimony, testifying that the Plaintiffs knew that the Defendants intended to offer art classes at the Café and agreed that increasing foot traffic at the store by offering art classes would be good for the business. Micah Easterling reiterated his wife's testimony that they would not have purchased the business without permission from the franchisor to offer art classes in the store.

18. The Defendants operated the Café for approximately four years before closing the business during the fall of 2017. From August of 2013 through December of 2017, the Defendants paid the Plaintiffs a total of $34,524.73. When the Defendants closed the Café, they owed the Plaintiffs approximately $93,000 under the Promissory Note.

---

[12]     Crest Foods, Inc. Franchise Agreement, Plaintiffs' Ex. 15.

19. Madsen testified that the Defendants did not abide by the terms of the Franchise Agreement, which places stringent requirements on the type of products used and sold by a franchisee. Instead, the Defendants admittedly used the business to conduct art classes and to sell arts and crafts, including birdhouses made by Micah Easterling.

20. According to Madsen, the Defendants also failed to use required products, to prepare freshly baked items daily, and to follow recipes approved by the franchisor. Madsen's testimony in this regard was limited because the Plaintiffs moved to Kentucky after selling the business to the Defendants. Accordingly, Madsen's personal knowledge of the daily operations of the Café was limited.

21. The only witness called by the Plaintiffs to support their allegations, other than the parties, was a former employee, Bridgett Warren (hereinafter "Warren"), who worked at the Café for the Plaintiffs from 2010 until they sold the Café. Warren also worked for the Defendants from 2014 to 2017, working night shifts and on weekends.

22. Warren testified that the Defendants purchased non-conforming products such as cookie dough, icing and ice cream from local grocery stores. Easterling explained that she experienced problems obtaining products from an authorized Crest distributor because the Café was the only Nestle Toll House franchise located in North Alabama. When unable to obtain supplies, she would purchase products from local suppliers. At trial, the Court admitted into evidence emails between Easterling and the franchisor in which the franchisor acknowledged the distribution issues the Defendants were experiencing. The franchisor explained that it was having trouble finding a distributor to provide products to the Café because the Defendants' store was the only Nestle franchise located in North

7

Alabama.[13] On cross-examination, Warren admitted that she was not personally familiar with the terms of the Café's Franchise Agreement nor privy to the Defendants discussions with the franchisor regarding the Café's distribution issues.

23. The Plaintiffs also allege that the Defendants used business funds for personal use, making payments on private loans, car payments, auto insurance, camper repair, personal meals, personal loans from their business account, and other personal expenses from the cash register. During the trial, business records maintained by the Defendants were admitted into evidence, documenting all cash paid into and out of the business.[14] The records reflect that the Defendants occasionally used business funds to pay for lunch meetings and other expenses such as lawn maintenance which were documented and not material. For example, the Defendants paid a total of $200 for lawn maintenance between 2014 and 2017 to an individual named Jim Flynt. As to the lunch meetings, the Defendants explained that they occasionally purchased lunch for Café employees as an incentive.

24. At trial, the Defendants also admitted that they used business funds to make car payments totaling $2,400 for Easterling's vehicle, which she used in the business to deliver cookie cakes. The Defendants both testified that Easterling used the vehicle to deliver cookie cakes several times per month. Warren disputed the Defendants' testimony, asserting that the Café rarely, if ever, delivered cookie cakes to customers. Admittedly, however, Warren only worked night shifts and on weekends.

25. Warren also insinuated that the Defendants used a point-of-sale system called Square Sales that was different from the equipment approved by the franchisor to avoid accurately

---

[13] Franchisor Email dated January 6, 2016, Defendants' Ex. 34; Franchisor Email dated January 7, 2016, Defendants' Ex. 35.
[14] *See* Paid In Out Report, Defendants' Ex. 32, itemizing all cash expenditures for the period January 6, 2014 through August 29, 2017.

reporting all sales to the franchisor. Easterling admitted that she was frequently unable to use the franchisor's point-of-sale system, even after the franchisor replaced the system, because it often failed to work with the Café's internet provider. According to Easterling, the franchisor was aware of the technical problems that she experienced with its point-of-sale system and gave her permission to use the Square Sales equipment when the franchisor's point-of-sale system was not operational. With the franchisor's permission, sales were then submitted daily by email to allow the franchisor to calculate royalties.[15]

26. Finally, Warren testified that the Defendants overcharged employees on their W-2s by adding tips as hours worked on which employees were then taxed, failed to timely pay employees, and failed to maintain proper payroll records. Warren produced copies of paychecks prepared by the Defendants' accountant, which reflected no issues in 2015, an accounting error involving tips totaling $136.14 during 2016, and an error on her March 17, 2017 paycheck involving tips totaling $14.00. Easterling explained that paychecks were typically prepared by her accountant and admitted that the Café experienced problems taxing cash tips as hours worked. Easterling worked with her accountant to rectify the issues and to adjust the paychecks when the problems were brought to her attention.

27. On cross-examination, Warren admitted that she appeared on an episode of a television show called Undercover Boss that was filmed at the Café, after which Crest Foods, Inc. promised to give Warren $10,000 to take her brother on a trip to Hawaii and $170,000 to open her own Nestle franchise. After the Undercover Boss episode was filmed at the Café, the franchisor cited the store for not having a working drive-through and for not following certain Nestle recipes. Thereafter, the franchisor made certain improvements to the Café,

---

[15]     Franchisor Email dated August 5, 2015, Defendants' Ex. 33.

Case 18-80041-CRJ     Doc 86     Filed 02/08/19     Entered 02/08/19 12:01:05     Desc Main
Document     Page 9 of 24

including replacing a freezer and the point-of-sale system. The franchisor also provided Easterling with additional training.

28. Crest Foods, Inc. performed on-site audits every six months and, according to the Defendants, never complained about the art classes nor the art sold at the Café. When audited, the Defendants routinely had art on the walls, signs on the windows offering art classes, and birdhouses made by Micah Easterling displayed on the counter. Crest never issued a non-compliance letter to the Defendants following the audits.

29. In September of 2017, Madsen testified that the Café's landlord notified her that he had evicted the Defendants and allowed the Plaintiffs to enter the store to remove their property. Upon entering the store, the Plaintiffs allege that they discovered that the Defendants had not maintained all of the equipment as required by the Purchase Agreement and that three pieces of equipment were missing, a waffle cone maker valued at $800, a metal table valued at $250, and a tent valued at $40. Madsen further testified that some of the equipment was damaged, including a freezer, under-counter refrigerator, icemaker, and blender. After recovering the equipment, the Plaintiffs either sold or stored the equipment in their garage. The Plaintiffs failed to credit the value of the recovered equipment against the balance owed under the terms of the Promissory Note.

30. Madsen also testified that the Defendants attempted to sell the assets of the Café without seeking permission from the Plaintiffs. The Defendants explained that they closed the Café after they were no longer able to obtain products and attempted to sell the business and the equipment with the intention of using the proceeds to pay the debt owed to the Plaintiffs. The Defendants testified that they never intended to sell the business or the equipment without using the proceeds to pay the Plaintiffs. Easterling testified that two parties were

10

interested in purchasing the Café until they reviewed Artistic Discovery's tax returns. At trial, Artistic Discovery's 2013 through 2017 Tax returns were admitted into evidence. The tax returns reveal that Artistic Discovery lost $81,957 during the four year period the Defendants operated the Café.[16]

31. After the Defendants closed the store and were unable to sell it as a going concern, the Defendants testified that they surrendered all of the equipment in the Café to the Plaintiffs, leaving the equipment in the store for the Plaintiffs to recover. According to the Defendants, all of the equipment remaining in the Café was in working condition when they were evicted. As to the three missing items, the Defendants testified that they discarded the waffle cone maker because it never worked when they purchased the Café and that they left the tent in the Café with all of the other equipment. As to the metal table, the Defendants testified that they bought the table for approximately $250 after they purchased the Café and admitted that they sold it to a church when the store closed.

32. The Plaintiffs allege that the Defendants failed to maintain adequate books and records and failed to make the records available to the Plaintiffs when the Café closed. Micah Easterling testified that he took off from work after the Café closed to remove the business records from the premises. The Defendants both testified that they turned over the business records to the franchisor and to the Plaintiffs.

33. On December 7, 2017, P&G Foods filed a Complaint against the Defendants and Artistic Discovery in the Circuit Court of Limestone County, Alabama, alleging breach of contract.[17] Gil and Patricia Madsen were not parties to the lawsuit. After the Café closed,

---

[16]    2013 – 2017 Federal Tax Returns for Artistic Discovery, Defendants' Exhibits 18, 19, 20, 21, and 22.
[17]    Complaint styled *P&G Foods, LLC v. Artistic Discovery, LLC, et al.,* CV-17-900389, Circuit Court of Limestone County, Alabama, Defendants' Ex. 31.

11

the Defendants continued making payments to the Plaintiffs under the terms of the Promissory Note until December of 2017 when P&G Foods filed the Complaint against the Defendants.

34. On January 9, 2018, the Defendants filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the Northern District of Alabama, Northern Division. On Schedule E/F, the Defendants listed the lawsuit filed by P&G Foods as an unsecured debt for $114,000. On Schedule G, the Defendants rejected both the Franchise Agreement with Crest Foods, Inc. and the Purchase Agreement with P&G Foods.

## II. CONCLUSIONS OF LAW

### A. Plaintiffs' Dischargeability Claim under 11 U.S.C. § 523(a)(2)(A)

A fundamental objective of the Bankruptcy Code is to provide a method by which "insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort."[18] While the Bankruptcy Code's fresh start policy is limited to honest debtors, "courts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor, and recognize that the reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural."[19]

To effectuate this fresh start policy, the "Bankruptcy Code contains broad provisions for the discharge of debts, subject to" certain limited exceptions enumerated under 11 U.S.C. § 523(a).[20] However, "[b]ecause 'the opportunity for a completely unencumbered new beginning'

---

[18]     *Beem v. Ferguson (In re Ferguson),* 713 Fed. Appx. 974, 977 (11th Cir. 2018)(*quoting In re St. Laurent,* 991 F.2d 672, 680 (11th Cir. 1993)).

[19]     *Taylor v. Wood (In re Wood)*, 245 Fed. Appx. 916, 917 (11th Cir. 2007)(*quoting In re Miller,* 39 F.3d 301, 304 (11th Cir. 1994)).

[20]     *Lamar, Archer & Cofrin v. Appling (In re Appling),* 138 S. Ct. 1752, 1758 (2018).

12

is limited to the honest debtor, *Grogan v. Garner,* 498 U.S. 279, 286-87, 111 S. Ct. 645, 112 L.
Ed. 2d 755 (1991), section 523(a)(2)(A) excludes from discharge debts obtained through 'false
pretenses, a false representation, or actual fraud.'"[21]

The applicable standard of proof in all dischargeability proceedings is the "ordinary
preponderance-of-the-evidence standard."[22] Thus, the Plaintiffs bear the burden of establishing by
a preponderance of the evidence that the debt owed by the Defendants should be excepted from
discharge under § 523(a)(2)(A).[23] To establish a claim under § 523(a)(2)(A) for fraud, the
Eleventh Circuit has required creditors to prove the following traditional elements of common law
fraud:

(1)    The debtor made a false representation with the intention of deceiving the
       creditor;

(2)    The creditor relied on the false representation;

(3)    The reliance was justified; and

(4)    The creditor sustained a loss as a result of the false representation.[24]

Similarly, for a debt to be nondischargeable under § 523(a)(2)(A) based on false pretenses
and false representations, a creditor must establish by a preponderance of the evidence that the
"debtor's representation was: (1) a knowing and fraudulent falsehood (2) describing past or current
facts (3) that was relied on by the other party."[25]

Here, the Plaintiffs allege that the Defendants suppressed their intended operation of the

---

[21]    *Stewart Title Guaranty v. Roberts-Dude (In re Roberts-Dude)*, 597 Fed. Appx. 615, 617 (11th Cir. 2015).
[22]    *Grogan v. Garner*, 498 U.S. 279, 291 (1991)(holding that the preponderance of the evidence standard is the proper burden of proof in nondischargeability proceedings).
[23]    *See Kane v. Stewart Tilghman Fox & Bianchi (In re Kane),* 755 F.3d 1285, 1293 (11th Cir. 2014)(citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).
[24]    *In re Roberts-Dude*, 597 Fed. Appx. at 617(*citing In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998)).
[25]    *Grain Marketing, LLC v. Smith (In re Smith)*, 585 B.R. 359 (Bankr. N.D. Miss. 2018)(*citing Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016)).

13

Café as an art studio when they purchased the business. Had the Plaintiffs known that the Defendants intended to operate the Café as an art studio in violation of the Franchise Agreement, the Plaintiffs contend that they would not have sold the business to the Defendants and loaned them money. Thus, the Plaintiffs seek to have the debt owed by the Defendants under the Promissory Note excepted from discharge as a debt for money obtained by false pretenses, a false representation or actual fraud within the meaning of § 523(a)(2)(A).

The Plaintiffs argue that the debt at issue was obtained by false pretenses and rely upon the case of *Matter of Johnson* in which the bankruptcy court recognized, for purposes of § 523(a)(2)(A), that "[f]alse pretenses may be implied" and "may consist of any acts, work, symbol or token calculated and intended to deceive . . . which, when considered collectively, create a false sense and misleading set of circumstances or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or to extend credit to the debtor."[26] The Plaintiffs argue that at all times the Defendants represented that they were entering into the Purchase Agreement and Promissory Note with the intent to operate the Nestle Toll House Café in compliance with the Franchise Agreement.

The Court has carefully considered the evidence and the testimony and finds that the Plaintiffs failed to establish by a preponderance of the evidence that the Defendants made a false representation with the intent to deceive the Plaintiffs regarding their intended operation of the Café when they purchased the business, by either the concealment or non-disclosure of required information.

The Court found the testimony of the Defendants credible regarding their intention, which

---

[26]     *Matter of Johnson*, 2017 WL 1839159 (Bankr. N.D. Ala. 2017)(*quoting FCC Nat'l Bank v. Gilmore (In re Gilmore)*, 211 B.R. 864, 872 (Bankr. N.D. Ala. 1998)).

they insist that they made known to both the franchisor and to the Plaintiffs, to offer art classes at the Café and to sell art at the store. According to Easterling, she always intended to combine her artistic endeavors with the cookie business by offering art classes in the Café to bring in new customers. Both she and her husband credibly testified that they would not have purchased the Café if Easterling could not have offered art classes at the store.

Easterling formed her traveling art studio while working for Madsen at the Café. Thereafter, the Plaintiffs, through P&G Foods, assigned the Nestle Franchise Agreement to an entity known as "Artistic Discovery." For the Plaintiffs to allege that the Defendants concealed or failed to disclose that they intended to offer art classes at the Café is simply not credible given that the Plaintiffs knew that the Defendants formed Artistic Discovery for the purposes of operating Easterling's traveling art studio. Indeed, the very name of the Defendants' company, "Artistic Discovery," reveals the intended artistic purpose and nature of the business.

The Court further finds that the Plaintiffs failed to establish that they relied upon any false representations by the Defendants regarding their intended operation of the Café. Although the Plaintiffs are not a party to the Franchise Agreement between Crest Foods, Inc. and Artistic Discovery, they seek to rely upon the terms of the Franchise Agreement to establish that the debt owed by the Defendants to the Plaintiffs pursuant to the terms of the Promissory Note should be excepted from discharge, arguing that the Defendants did not abide by the terms of the Franchise Agreement. The Defendants argue that the Plaintiffs are not a party to the Franchise Agreement and, therefore, cannot object to the Defendants' discharge or the dischargeability of the debt based upon any alleged breach of the Franchise Agreement by Artistic Discovery. Assuming that the Plaintiffs have standing to purse these claims as a non-party to the Franchise Agreement, the Court finds that the Plaintiffs failed to establish that they relied upon any false representations by the

15

Defendants regarding their intended operation of the Café pursuant to the terms of the Franchise Agreement.

While the Plaintiffs clearly do not approve of the manner in which the Defendants operated the Café, the Court finds that the Defendants adequately explained why they were unable to comply with certain terms of the Franchise Agreement. As the only Nestle franchise located in North Alabama, the franchisor was unable to provide a distributor for the Café on a regular basis. When unable to obtain supplies from an authorized distributor, Easterling explained that she purchased products from local suppliers. While the Plaintiffs also generally alleged that the Defendants failed to prepare freshly baked items daily and to follow approved recipes, the Plaintiffs personal knowledge regarding the Defendants daily operations of the store was limited as the Plaintiffs reside out of state. The testimony of the Defendants' former employee, Warren, was not credible and her testimony was limited as she only worked night shifts and on weekends. The Defendants' failure to manage the Café to the Plaintiffs' complete satisfaction does not constitute fraud or false pretenses for purposes of § 523(a)(2)(A).[27]

Finally, "[f]or a debt to be nondischargeable under § 523(a)(2)(A), a creditor must establish that it 'sustained a loss as a result of the misrepresentation."[28] In this case, it was undisputed that the Café was not profitable from the time the Plaintiffs opened the store in July of 2008 through 2011. While Madsen testified that the Café experienced a "great year" in 2012, the evidence does not reflect Madsen's enthusiasm. Rather, the evidence reveals that the Plaintiffs sold a business to the Defendants against which both state and federal tax liens were filed for 2012. Further, P&G Foods 2013 Federal Tax Return reflects a loss of $23,675. While the Café continued to lose money

---

[27] *See Cox v. Richardson (In re Cox)*, 462 B.R. 746, 759 (Bankr. D. Idaho 2011)(explaining that a purchaser's failure to manage a business to the seller's satisfaction was not fraudulent for purposes of § 523(a)(2)(A)).
[28] *Sears v. United States (In re Sears)*, 533 Fed. Appx. 941, 947 (11th Cir. 2013).

16

after the Plaintiffs sold the business to the Defendants, the Plaintiffs failed to establish that the resulting debt owed to the Plaintiffs was because either the Defendants or Artistic Discovery breached any terms of the Franchise Agreement with Crest Foods, Inc. In addition to lacking experience in the food industry and lacking experience operating a business, the evidence reveals that the Defendants experienced continuing problems obtaining products from an authorized distributor because the Café was the only Nestle franchise in North Alabama.   Accordingly, the Court finds that the Plaintiffs failed to establish that they sustained a loss as a result of any false representation made by the Defendants.

Based upon the foregoing, the Court finds that the Plaintiffs failed to establish by a preponderance of the evidence that the debt at issue should be excepted from discharge under § 523(a)(2)(A) as a debt obtained by false pretenses, a false representation or fraud.

## B.  Plaintiffs' Objections to Discharge Under 11 U.S.C. § 727(a)(2), (a)(3) and (a)(5)

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition."[29]  Indeed, "the denial of debtor's discharge is an 'extraordinary remedy' and an 'extreme penalty.'"[30]   Accordingly, objections to discharge are strictly construed against an objecting creditor and liberally in favor of a debtor.[31]  The objecting creditor bears the burden of establishing by a preponderance of the evidence that a debtor is not entitled to a discharge.[32]

In this case, the Plaintiffs object to the Defendants' Chapter 7 discharge, alleging that the

---

[29]     *In re Kane*, 755 F.3d 1285, 1292 (11th Cir. 2014)(*quoting In re Mitchell*, 633 F.3d 1319, 1326 (11th Cir. 2011)).

[30]     *Fiandola v. Moore (In re Moore)*, 508 B.R. 488, 494 (Bankr. M.D. Fla. 2014).

[31]     *Id.*

[32]     *Id.*

17

Defendants: (i) failed to maintain business assets and records pursuant to the terms of the parties' purchase agreement; (ii) attempted to sell business assets without the Plaintiffs' permission; and (iii) failed to maintain books and records and to account for, or adequately explain, certain accounting procedures.

### a. 11 U.S.C. § 727(a)(2)

Section 727(a)(2) of the Bankruptcy Code provides that a court shall grant a Chapter 7 debtor's discharge, unless --

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> (A)  property of the debtor, within one year before the date of the filing of the petition; or
>
> (B)  property of the estate, after the date of the filing of the petition[.][33]

As explained by the Eleventh Circuit, to successfully object to a debtor's discharge under § 727(a)(2), a creditor must establish "by a preponderance of the evidence that the challenged action (1) happened in the year before the bankruptcy petition was filed; (2) was done 'with actual intent to hinder, delay, or defraud a creditor'; (3) was an act of the debtor; and (4) involved the transfer, removal, destruction, mutilation, or concealment of property of the debtor."[34]

A creditor is not required to present direct evidence of a debtor's bad intent for purposes of § 727(a)(2). Instead, "the debtor's intent may be established by circumstantial evidence or inferred from the debtor's course of conduct."[35] The Eleventh Circuit has identified the following

---

[33]     11 U.S.C. § 727(a)(2).
[34]     *Hintze v. Bender (In re Hintze)*, 739 Fed. Appx. 579, 582 (11th Cir. 2018)(*citing In re Jennings*, 533 F.3d 1333, 1338 (11th Cir. 2008)); *See also Coady v. D.A.N. Joint Venture, III, L.P. (In re Coady)*, 588 F.3d 1312, 1316 (11th Cir. 2009).
[35]     *Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane)*, 755 F.3d 1285, 1298 (11th Cir. 2014).

18

indicia of fraud, tending to show that a debtor had an actual intent to defraud creditors –

(1) the lack or inadequacy of consideration for the property received;

(2) the nature of the relationship between the transferor and the transferee;

(3) whether the transferor retains possession, control, benefits or use of the property in question;

(4) whether the transfer resulted in insolvency;

(5) the cumulative effect of the debtor's transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors; and

(6) the general chronology and timing of the transfer in question.[36]

For purposes of § 727(a)(2), the Plaintiffs allege that the Defendants attempted to sell the Café without their permission, never approached the Plaintiffs to let them know that the store's closure was imminent, failed to maintain assets and business records, and removed or destroyed equipment. The Defendants maintain that they surrendered all business property owned by P&G Foods to the Plaintiffs when they closed the Café and that they did not transfer any property belonging to the business to third parties while they were insolvent.

The Court finds that the Plaintiffs allegations are insufficient to deny the Defendants' Chapter 7 discharge pursuant to § 727(a)(2). While the Defendants admitted that they tried to sell the Café as a going concern to a third party, the sale never transpired. Further, the Defendants maintain that they were attempting to sell the Café with the stated intent of paying the balance owed to the Plaintiffs under the terms of the Promissory Note. No evidence to the contrary was presented.

As to the three pieces of equipment which the Plaintiffs allege were missing or destroyed,

---

[36]    *Protos v. Silver (In re Protos)*, 322 Fed. Appx. 930, 936 (11th Cir. 2009)(*citing In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008)).

the Defendants adequately and credibly explained the loss of each. The Defendants testified that the waffle cone maker, valued at $800, never worked when they purchased the Café from the Plaintiffs and was subsequently discarded. According to the Defendants, they left the tent valued at $40 in the store when they were evicted. Finally, the Defendants admit that they sold a metal table valued at approximately $250 to a church when the Café closed, but the Defendants maintain that they purchased the table after they purchased the Café from the Plaintiffs. Certainly, the transfer or loss of these three items did not result in the Defendants' insolvency and are not material. As to the equipment that the Plaintiffs allege was damaged, both Defendants disputed the allegations and credibly testified that the equipment was in working condition when they were evicted.

Thus, the Court finds for purposes of § 727(a)(2) that the Plaintiffs failed to establish by a preponderance of the evidence that the Defendants transferred, removed, destroyed, mutilated, or concealed property of the Defendants, within one year before the date of the filing of the petition.

### b. 11 U.S.C. § 727(a)(3)

Section 727(a)(3) of the Bankruptcy Code provides that a court shall grant a Chapter 7 debtor's discharge, unless --

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act was justified under all of the circumstances of the case[.]"[37]

"Subsection (a)(3) does not contain a fraudulent intent requirement."[38] Instead, to justify denial under § 727(a)(3), a creditor must establish by a preponderance of the evidence that the

---

[37]     11 U.S.C. § 727(a)(3).
[38]     *Protos v. Silver (In re Protos)*, 322 Fed. Appx. 930, 935 (11th Cir. 2009).

debtor: " (1) either failed to keep or preserve any recorded information, or committed an act of destruction, mutilation, falsification, or concealment of any recorded information; and (2) that as a result of such failure to act, it is impossible to ascertain the financial condition and material business transactions of the debtor."[39]

Here, the Plaintiffs allege that the Defendants removed file cabinets from the Café before they were evicted and that none of the books and records of the Café were available to the Plaintiffs. The Defendants counter that they fully complied with all requests for information made by the Chapter 7 Trustee and by the Plaintiffs. Further, the Defendants testified that all business records were turned over to the franchisor and/or the Plaintiffs after they closed the store. Micah Easterling testified that he took off from work after the Café closed to remove the records and that the records were turned over either to the Plaintiffs or to the franchisor. While the Plaintiffs assert that the Defendants have failed to explain missing records and vaguely allege that the Defendants used questionable accounting procedures, the Plaintiffs failed to specifically identify any missing records or to establish that they were unable to ascertain the financial condition of the Defendants based upon any missing records.

While the Plaintiffs also generally allege that the Defendants failed to report all sales to their franchisor, no evidence was presented to establish this allegation. Although the Defendants' former employee testified that the franchisor's point-of-sale system worked and that the Defendants used a different system to avoid reporting sales, the employee's credibility was questionable at best. The employee appeared hostile, possibly because she blames the Defendants for improperly taxing her tips. She also appeared to have an ulterior motive for testifying against the Defendants, as she has been promised her own Nestle franchise after appearing on an episode

---

[39] *Buckeye Retirement Co. v. Bishop (In re Bishop)*, 420 B.R. 841, 849 (Bankr. N.D. Ala. 2009).

21

of Undercover Boss.

The Plaintiffs also allege that the Defendants used their business account to pay for various personal expenses, including meals and other expenditures. The Defendants testified that they occasionally purchased pizza as an incentive for employees and admitted to occasionally taking cash out of the Café's cash register to pay for lawn maintenance. While the Defendants' former employee testified that the Defendants never purchased meals for employees, the Court notes that the employee only worked night shifts and on weekends so her knowledge of what transpired in the Café on a daily basis was limited. The Defendants provided detailed business records reflecting all cash paid into and out of Artistic Discovery for January of 2014 through August of 2017. The records reflect limited personal expenditures for lawn maintenance and reflected occasional expenditures for items listed as lunch meetings.

Based upon the forgoing, the Court finds that the Plaintiffs failed to establish by a preponderance of the evidence that the Defendants concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained.

### c.    11 U.S.C. § 727(a)(5)

Section 727(a)(5) of the Bankruptcy Code provides that the court shall grant a debtor a discharge unless "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities[.]"[40]   To establish a prima facie case under § 727(a)(5), the Plaintiffs must establish by a preponderance of the evidence that the Defendants experienced a loss or deficiency of assets that they cannot satisfactorily explain.   "The question of whether a

---

[40]        11 U.S.C. § 727(a)(5).

debtor satisfactorily explains a loss of assets is a question of fact."[41]

Based upon the testimony and evidence presented, the Court finds that the Plaintiffs failed to establish that the Defendants experienced a loss or deficiencies of assets which they have failed to satisfactorily explain for purposes of § 727(a)(5). The Plaintiffs have failed to satisfy their initial burden of production by establishing that the Defendants failed to account for assets which they formerly owned but that were unavailable for distribution to creditors. Rather, the Plaintiffs have made vague allegations that the Defendants failed to explain the loss of Artistic Discovery's assets to meet the liability owed to the Plaintiffs.[42] The only three pieces of equipment that the Plaintiffs identified as missing, a waffle cone maker, tent and metal table, were not material in value. Further, the Defendants satisfactorily explained that the waffle cone maker no longer worked, that they left the tent at the Café after the store closed, and that they sold the metal table valued at $250 to local church. The Defendants further testified that they purchased the table after they purchased the Café from the Defendants.

Based upon the forgoing, the Court finds that the Plaintiffs failed to establish a prima facie case under § 727(a)(5) that the Defendants experienced a loss or deficiency of assets that they cannot satisfactorily explain.

### III. CONCLUSION

For the reasons stated, the Plaintiffs have failed to carry their burden to prove that the debt owed under the Promissory Note is nondischargeable under 11 U.S.C. § 523(a)(2)(A). The Plaintiffs failed to establish that the Defendants made a false representation upon which the

---

[41]    *In re Protos*, 322 Fed. Appx. 930, 934 (11th Cir. 2009)(*quoting In re Chalik*, 748 F.2d. 616, 619 (11th Cir. 2005)).

[42]    *See Fiandola v. Moore (In re Moore)*, 619 Fed. Appx. 951, 954 (11th Cir. 2015)(explaining that a debtor was under no obligation to explain the loss of corporate owned assets for purposes of § 727(a)(5)).

23

Plaintiffs justifiably relied as a result of which the Plaintiffs sustained a loss for purposes of § 523(a)(2)(A). The Plaintiffs have also failed to carry their burden to prove that the Defendants' Chapter 7 discharge should be denied under 11 U.S.C. § 727(a)(2), (a)(3) or (a)(5).

The Court will enter a separate Judgment in conformity with this Memorandum Opinion.


Dated this the 8th day of February, 2019.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge

Case 18-80041-CRJ    Doc 86    Filed 02/08/19    Entered 02/08/19 12:01:05    Desc Main
Document    Page 24 of 24